## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 1:14-cr-00114-PB** |
| | ) | |
| **WILLIAM ALBA** | ) | |

_____

### GOVERNMENT'S SENTENCING MEMORANDUM

Pursuant to the Court's Order of June 2, 2016, the United States submits this memorandum to explain why a downward departure regarding the defendant's Criminal History Category is not appropriate.   The government also will address the Court's concerns about a potential disparity between the sentence of defendants in a related case and this defendant's sentencing exposure. Finally, the government will briefly address the variance arguments made by the defendant.

### BACKGROUND

The defendant has pleaded guilty to participating in a conspiracy to distribute controlled substances.   As set forth in the Presentence Investigation Report ("PSR"), the defendant and others were involved in the distribution of thousands of oxycodone pills in the Manchester, New Hampshire area.

During a law enforcement investigation in the summer of 2014, the defendant was intercepted over wiretaps in which he regularly discussed drug trafficking activities with Samuel Garcia and Jennifer Nunez.   He frequently traveled to their apartment on Eastern Avenue to obtain quantities of oxycodone pills, which he then sold to multiple customers.   During a post-*Miranda* statement (which was audio and video recorded), the defendant admitted that he had been purchasing 400 to 500 pills from Garcia on a weekly basis for approximately one year.   He acknowledged having multiple customers, including one customer who purchased 100 pills at a

time.   He further expressed broader knowledge of Garcia's operation, acknowledging that Garcia

obtained between 1,000 and 2,000 pills at a time from a source in New York.   *See* PSR at ¶¶

9-12.   Additionally, a search warrant was executed at the defendant's residence, which yielded

over $433 in cash, as well as a handgun.   A search of a vehicle associated with the defendant

yielded an additional $4,055 in cash.[1]

The PSR found, and the defendant does not dispute, that he is responsible for the

distribution of approximately 15,600 oxycodone tablets.   As a result, it is not disputed that the

defendant's base offense level is 32.

## DISCUSSION

### I.   The Defendant's Criminal History is not Overstated.

The PSR correctly has calculated that the defendant's Criminal History Category ("CHC")

is III.   However, at the hearing on June 2, 2016, the Court suggested that the CHC may be

overstated and that it was considering a downward departure to a CHC of II.   No such departure is

appropriate.

A downward departure under U.S.S.G. § 4A1.3(b) is only appropriate where "the

defendant's criminal history category substantially over-represents the seriousness of the

defendant's criminal history or the likelihood that the defendant will commit other crimes."

U.S.S.G. § 4A1.3(b)(1).   The defendant's CHC does not over-represent his criminal history at all.

An analysis of the defendant's criminal history shows that his criminal history category is far from

over-representative because, under slightly different circumstances, he could be a career offender.

---

[1] Paragraph 12 of the PSR appears to conflate these two separate seizures and could be read to suggest that $4,500 was seized from the apartment.   Approximately $433 was seized from the apartment and $4,055 was seized from the vehicle, yielding a total of $4,488.

The defendant's CHC of III is based upon multiple prior convictions.   One conviction is a felony attempted robbery conviction in 2009 that arose from a beating and robbery of an individual.   PSR at ¶ 32.   This offense is a felony crime of violence for career offender analysis under U.S.S.G. § 4B1.2.   *See Almanzar v. United States*, 2013 WL 5525703 at *5 (E.D.N.Y. Sept. 30, 2013) (New York conviction for attempted robbery in second degree is qualifying crime of violence for career offender analysis).

The defendant also has been convicted in New York of a misdemeanor criminal sale of marijuana charge that relates to his sale of marijuana to an undercover police officer.   PSR at ¶ 35. Had the defendant been convicted of this conduct in New Hampshire, the conduct would have constituted a felony offense.   *See* N.H. Rev. Stat. Ann. § 318-B:26.   Similarly, this sale of marijuana would have constituted a felony offense under federal law.   *See* 21 U.S.C. §§ 841(a)(1) and (b)(1)(D).   Thus, had the defendant's drug transaction taken place in a location other than New York, it may have resulted in a prior felony conviction for a "controlled substance offense" within the meaning of U.S.S.G. § 4B1.2(b).

The defendant also has been convicted of a misdemeanor third degree assault in New York. The facts of the assault case suggest that the defendant committed a violent act in that he "head butted" the victim, kicked her to the body and face, bit her, and dragged her on the ground.   PSR at ¶ 33.   This conduct potentially could have been prosecuted as a second degree assault under New York law.[2]   Had the defendant been convicted of felony second degree assault under New York law, he would have been a career offender.   *See United States v. Walker*, 442 F.3d 787,

---

[2] Under New York law a person commits second degree assault when "[w]ith the intent to cause serious physical injury to another person, he causes such injury to such person or to a third person."   N.Y. Penal Law § 120.05.

788-89 (2d Cir. 2006) (New York conviction for attempted second degree assault constitutes crime of violence under Armed Career Criminal Act).

As set forth above, although the defendant is not a career offender, his criminal history suggests that his actual history of criminal conduct includes crimes of violence and drug crimes that are quite similar to crimes that could cause an individual to be classified as a career offender under U.S.S.G. § 4B1.1.   Had the defendant been a career offender, his CHC would have been VI and his guideline range likely would have been 151 to 188 months.   Under these circumstances, a CHC of III simply does not substantially over-represent the seriousness of the defendant's criminal history.

Other aspects of the defendant's criminal history also suggest that a CHC of III is appropriate.   The defendant has six criminal history points.   *See* PSR at ¶ 37.   This is on the outer edge of CHC III, which only requires four criminal history points.   The defendant's criminal history includes uncounted conduct that reflects a lack of respect for the criminal justice system, including multiple positive drug tests and an arrest while participating in an alternative to incarceration program.   *See* PSR at ¶ 32.   He also has a prior conviction for bail jumping based upon his failure to appear in court.   *See* PSR at ¶ 34.   In light of the defendant's substantial criminal conduct, including four criminal convictions, as well as his other uncharged criminal activities, a CHC of III is completely appropriate.

The defendant, who is 25 years old, moved to New Hampshire in 2012.   Notably, he has no history of employment in New Hampshire and almost no history of employment whatsoever. PSR at ¶ 53.   The clear implication of this is that the defendant used the sale of oxycodone as a

means of supporting himself.[3]   None of his four prior convictions served to deter him from participating in ongoing criminal activity.   Rather, his conduct escalated from the sale of marijuana to the sale of a powerful opiate that has contributed substantially to the drug addiction problem that is plaguing New Hampshire.

Given that the defendant has six criminal history points based upon crimes that involved violence, drug sales, and bail jumping, his lack of employment history, and his participation in a lengthy and substantial drug distribution conspiracy, a CHC of III is reasonable and appropriate. Nothing in the defendant's history suggests that his criminal history is substantially overstated. *See United States v. Battle*, 637 F.3d 44 (defendant's criminal history, seriousness of offenses, and timing of crimes after release from custody weighed against downward departure).   Accordingly, the Court should not depart downward from a CHC III to CHC II.

## II.      There are Significant Reasons why the Defendant Faces a Different Sentence than some Defendants in a Related Case.

At the hearing on June 2, 2016, the Court expressed concern that defendants in a related case had received a lesser sentence than defendant Alba faces.   This case is related to a six-defendant case, *United States v. Samuel Garcia, et al.*, Crim. No. 14-123-JL.   Three defendants in that case are awaiting sentencing.   However, the PSRs for those defendants (Samuel Garcia, Jennifer Nunez, and Jose Nunez) indicate that each of them is facing a much higher sentence than this defendant.   In addition to being held accountable for drug quantities at or higher than level 32, all three of these defendants pleaded guilty to violating 18 U.S.C. § 924(c), which carries a separate five-year mandatory minimum sentence.   Additionally, Samuel Garcia

---

[3] The defendant's substance abuse history makes no reference to abuse of oxycodone.   Thus, his acquisition of oxycodone pills from Garcia and his associates was solely for the purpose of distribution to others.

and Jose Nunez have pleaded guilty to money laundering.   Garcia also likely will be subject to a

role enhancement under U.S.S.G. § 3B1.1.   Thus, the guideline exposure of defendant Alba is far

lower than the exposure of the three individuals who are awaiting sentencing.

   The Court expressed concern about a potential sentencing disparity between this defendant

and Johanna Nunez, who was sentenced 51 months in prison.   There are a number of factual

distinctions between these individuals.   First, Johanna Nunez was found to be accountable for a

drug quantity that placed her at offense level 30.   Despite witness information indicating that

Johanna Nunez was actively distributing drugs for a period of time, there was evidence that she did

not move to New Hampshire (and join the conspiracy) until approximately October of 2013.   As a

result, she only was held accountable for approximately 300 pills per week for the time period

from October 2013 to August of 2014 (a total of approximately 13,000 oxycodone pills), which

resulted in a base offense level of 30.[4]   Second, unlike defendant Alba, Johanna Nunez had no

criminal history and qualified for a two-level reduction under the "safety valve" provision of

U.S.S.G. § 2D1.1(b)(17).   After obtaining credit for acceptance of responsibility, her guideline

range was 57 to 71 months.   Third, Judge Laplante (over the government's objection) granted a

six-month downward departure under U.S.S.G. § 5H1.6 based upon family responsibilities and

sentenced defendant Johanna Nunez to 51 months in prison.   *See* PSR at ¶ 7.   No such downward

departure is being sought (or would be appropriate) here.

   The matter of defendant Raul Hernandez is also readily distinguishable.   Defendant

Hernandez, who received a 48-month sentence, only participated in the conspiracy for a few

---

[4] At the hearing on June 2, 2016, counsel for the government inaccurately stated that the name of Johanna Nunez did not appear on drug ledgers seized in this case.   Her name, as well as defendant Alba's name, appeared in these ledgers.   However, these ledgers only covered a small portion of the time frame of the conspiracy and were not a complete accounting of the conspiracy's drug activity.

months and was found responsible for a much smaller quantity of drugs (approximately 4,800 oxycodone pills).   This resulted in a base offense level of 28, which is much lower than the defendant's offense level.   After receiving credit for acceptance of responsibility, his offense level was 25.   With a CHC of I, his sentencing range was 57 to 71 months.   Thus, the sentence for Hernandez was a result of both a lower drug quantity and a lower CHC.   Moreover, Judge Laplante granted a downward departure (over the government's objection) under U.S.S.G. § 5K2.0 based upon extraordinary rehabilitation efforts and imposed a sentence of 48 months. *See* PSR at ¶ 7.   No such departure is being sought in this case.

As discussed above, defendant Alba has admitted to being responsible for a larger drug quantity that Johanna Nunez or Raul Hernandez.   In addition to his post-arrest admission, these drug quantity estimates are corroborated by other information obtained in this investigation, including witness statements, drug ledgers, and intercepted telephone calls.   Most notably, the defendant has not contested the drug weight calculation set forth in the PSR.   In light of the quantity of drugs attributable to the defendant and his substantial criminal history, the PSR's calculation of a guideline range of 108 to 135 months is accurate and no departure or variance from that range is appropriate.

### III.    A Downward Variance is Not Appropriate.

The defendant has argued that the Court should grant a downward variance pursuant to *United States v. Booker*, 543 U.S. 220 (2005).   The defendant argues that his unfortunate upbringing merits a downward variance.   However, the defendant's history of serious offenses, including crimes of violence and drug trafficking offenses suggest that a variance is not appropriate.   Rather, several of the factors set forth in 18 U.S.C. § 3553(a) support the need for a

substantial prison sentence, including the need for deterrence, the need for public protection, and the need to reflect the seriousness of the defendant's drug trafficking crimes.[5]

While the government does not suggest that the defendant was the leader of this operation, he was (by his own admission) responsible for the distribution of thousands of oxycodone pills on the streets of Manchester.   As the Court well knows, there is a substantial opiate abuse problem in Manchester.   Opiate overdoses having increased throughout the state.   Often, individuals who become addicted to oxycodone pills find themselves turning to heroin use, which also has been increasing in the community.   By putting over 15,000 oxycodone pills on the streets of Manchester, the defendant played a significant role in feeding the city's drug problem.   The Court must impose a sentence that will deter others from following in the defendant's footsteps.   Any departure or variance sought by the defendant would not be just in light of the very serious scope of the defendant's criminal conduct.

---

[5]  Although the defendant argues that he was not one of the targets of the investigation, he was named as a target of the Title III wiretap investigation at the time it was initiated.   That investigation confirmed intelligence information indicating that the defendant regularly distributed oxycodone pills.

**CONCLUSION**

For the reasons set forth above, the Court should not grant a downward departure that reduces the defendant's Criminal History Category.   The Court also should not grant a departure or variance based upon any of the arguments made by the defendant.

Respectfully submitted,

EMILY GRAY RICE
United States Attorney

June 7, 2016                                    By: /s/ John J. Farley
John J. Farley
Assistant U.S. Attorney
NH Bar No. 16934
53 Pleasant Street
Concord, NH   03301
(603) 225-1552
John.Farley@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document was served via ECF upon counsel for the defendant.

June 7, 2016                                    By:    /s/ John J. Farley
John J. Farley
Assistant U.S. Attorney